**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CRAFT INTERNATIONAL, LLC** | § | **CASE NO. 14-32605-BJH-11** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **TAYA KYLE** | § | |
| | § | **ADVERSARY NO. 14-03115-BJH** |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **CRAFT INTERNATIONAL, LLC** | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**REQUEST FOR TEMPORARY INJUNCTION**


**PRONSKE GOOLSBY**
**& KATHMAN, P.C.**

Gerrit M. Pronske
Texas Bar No. 16351640
Jason P. Kathman
Texas Bar No. 24070036

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

BACKGROUND ...............................................................................................................2

    A. Craft, Chris and his Logo.......................................................................... 2
    B. The State Court Lawsuit. .......................................................................... 3
    C. The Likeness Adversary ........................................................................... 3

ARGUMENT AND AUTHORITY ...................................................................................4

    I. TAYA KYLE IS ENTITLED TO INJUNCTIVE RELIEF....................................4

    A. Likelihood of Success on the Merits.......................................................... 5
    B. Irreparable Harm..................................................................................... 7
    C. Balance of Hardships............................................................................... 8
    D. Public Interest ........................................................................................ 9

    II. DEBTOR'S DEFENSES ARE MERITLESS AND DO NOT PREVENT
        INJUNCTIVE RELIEF. ......................................................................... 10

    A. Chris' Alleged License to 5.11 to Use his Likeness Does Not Prohibit Taya from Suing
       Under Chapter 26 of the Texas Property Code................................................ 10

        i. *Chris did not transfer his property rights by allegedly licensing them to 5.11.*...... 10
        ii. *The License does not grant permission for Debtor to use Chris' Publicity*
          *Rights.*...........................................................................................12
        iii. *5.11 cannot sub-license the purported license to use Chris' Publicity Rights*
          *it received in the Release.* ..................................................................12

    B. Taya's Ownership of Only 50% of Property Rights in Chris' Name, Likeness and Image
       Does Not Bar the Claims. .......................................................................... 14

    C. Chris' Status as a Public Figure Does Not Preclude the Chapter 26 Causes of Action.... 15

        i. *"Right of Publicity" vs. "Right of Privacy"*...........................................................15
        ii. *Chris' status as a public figure does not preclude Taya from exercising the statutory*
          *"Rights of Publicity" specified in in Chapter 26 of the Texas Property Code*........................18

    D. Debtor's Admitted Use of Chris' Name Likeness and Image is a Violation of
       Section 26.011. ....................................................................................... 19

CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

## Federal Cases

*Brown v. Ames,*
201 F.3d 654 (5th Cir. 2000) ............................................................................ 11

*Byrum v. Landreth,*
566 F.3d 442 (5th Cir. 2009) .............................................................................. 5

*Deerfield Medical Center v. City of Deerfield Beach,*
661 F.2d 328 (5th Cir. 1981) ............................................................................... 7

*Elvis Presley Enters, Inc. v. Capece,*
950 F. Supp. 783 (S.D. Tex. 1996),
*reversed and remanded on other grounds* 141 F.3d 188 (5th Cir. 1998) ............. 16

*Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,*
202 F. 2d 866 (2d Cir. 1953).............................................................................. 16

*Henley v. Dillard Dept. Stores,*
46 F. Supp. 2d 587 (N.D. Tex. 1999) ................................................................. 16

*Hoxworth v. Binder, Robinson & Co., Inc.,*
903 F.2d 186, (3d Cir. 1990)................................................................................ 8

*Lake Charles Die sel, Inc. v. Gen. Motors Corp.,*
328 F.3d 192 (5th Cir. 2003) ................................................................................ 5

*Mantle v. Upper Deck Co.,*
956 F. Supp. 719 (N.D. Tex. 1997) ...................................................................... 5

*Matthews v. Wozencraft,*
15 F.3d 432 (5th Cir. 1994) ................................................................................ 18

*Miller v. Glenn Miller Prods.,*
318 F. Supp. 2d 923 (C.D. Cal. 2004),
*aff'd*, 454 F.3d 975 (9th Cir. 2006)............................................................... 13, 14

*Miss. Power & Light Co. v. United Gas Pipe Line,*
760 F.2d 618 (5th Cir. 1985) ............................................................................... 5

*Moore v. Big Picture Co.,*
828 F.2d 270 (5th Cir. 1987) ............................................................................. 16

*NaturaLawn of America, Inc. v. West Group, LLC,*
    484 F. Supp. 2d 392 (D. Md. 2007) ................................................................... 9

*O'Brien v. Pabst Sales Co.,*
    124 F.2d 167 (5th Cir. 1942) ........................................................... 17, 18, 19

*Petro Franchise Sys., LLC v. All American Props., Inc.,*
    607 F. Supp. 2d 781 (W.D. Tex. 2009) .............................................................. 9

*Roland Mach. Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984) ........................................................................... 8

Speaks *v. Kruse,*
    445 F.3d 396, 399-400 (5th Cir. 2006) ........................................................... 5

*TGI Friday's Inc. v. Great Northwest Restaurants, Inc.,*
    652 F. Supp. 2d 763 (N.D. Tex. 2009) .............................................................. 9

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................................... 5

*Winter v. Natural Res. Defense Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................... 5

## State Cases

*Billings v. Atkinson,*
    489 S.W.2d 858 (Tex. 1973) ............................................................................ 16

*Kimbrough v. Coca-Cola/USA,*
    521 S.W.2d 719 (Tex. Civ. App.—Eastland 1975, writ ref'd n.r.e.) ................ 17

*Namath v. Sports Illustrated,*
    48 A.D. 2d 487 (N.Y.A.D. 1 Dept. 1975). ....................................................... 20

*U.S. Life Ins. Co. v. Hamilton,*
    238 S.W.2d 289 (Tex. Civ. App.—Waco 1951, writ ref'd n.r.e.) ..................... 16

*Vinci v. American Can Corp.,*
    591 N.E.2d 793 (Ohio App. 8th Dist. 1990). ................................................. 20

## Statutes

17 U.S.C. 201 ......................................................................................................... 11

Tex. Fam. Code § 153.132(5) ................................................................................. 15

Tex. Prop. Code § 26.002 ................................................................................................ 5

Tex. Prop. Code § 26.004 ................................................................................................ 6

Tex. Prop. Code § 26.005(a)(2) ...................................................................................... 6

Tex. Prop. Code § 26.005(c) .......................................................................................... 14

Tex. Prop. Code § 26.011 ........................................................................................... 5, 7

## Rules

Fed. R. Bankr. P. 7065 .................................................................................................... 4

Fed. R. Civ. P. 65 ............................................................................................................ 4

Tex. R. Civ. P. 44(1) ...................................................................................................... 15

## Other Source

J. McCarthy, *Melville B. Nimmer and the Right of Publicity: A Tribute*,
    34 UCLA L. Rev. 1703, 1704 (1987) ................................................................. 16

Melville B. Nimmer, *The Right of Publicity*,
    19 LAW & CONTEMP. PROBS. 203, 216 (1954) .................................................. 16

**TO THE HONORABLE BARBARA J. HOUSER,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Taya Kyle ("Taya" or "Plaintiff") files this her Brief in Support of Request for Temporary Injunction ("Taya's Brief") and, in support thereof, would respectfully show unto the Court as follows:

## INTRODUCTION

1.      Texas law clearly provides that the right to use Chris Kyle's name, likeness and image belongs solely to Taya Kyle and her children. Additionally, Texas law makes equally clear that a cause of action exists for the unauthorized use a deceased person's name, likeness or image. The Debtor does not deny that it is currently using the name, likeness and image of Chris Kyle; rather, it attempts to argue that its use is authorized via a license, that Taya lacks standing to sue, and Chris' status as a public figure insulates the Debtor from liability. For the reasons stated more fully herein, the defenses argued by the Debtor are contrary to case law on the subject, contrary to public policy and are inapplicable. As such, the Debtor's admitted continued use of Chris Kyle's name, likeness and image is a violation of Chapter 26 of the Texas Property Code.

2.      Taya Kyle can show (i) that she is likely to win on her cause of action under Chapter 26 of the Texas Property Code, (ii) that she will suffer irreparable harm by the Debtor's continued use of Chris Kyle's name, likeness and image without her consent, (iii) that the balance of the harms weighs dramatically in Taya Kyle's favor and (iv) that granting the temporary injunction is in the public interest. Based upon the evidence available, the Court should grant the Plaintiff's request for temporary injunction in the Adversary Complaint.

# BACKGROUND

### A.    Craft, Chris and his Logo.

3.    Craft International, LLC ("Craft" or "Debtor") is a Texas limited liability company that purportedly provides consulting and training services to federal, state and local customers.[1] Further, the Debtor advertises that it was founded by a mix of Special Operations Forces Operators and successful businessmen and consults with and trains our nation's Special Operators and First Responders.[2] Finally, the Debtor alleges to be a leader in integrated training and security solutions for operations in austere environment situations.[3] The Debtor owns a trademarked logo that was designed by Chris Kyle, which the Debtor uses to place on merchandise and sell to the public.

4.    The Debtor was co-founded in 2009 by Chris Kyle ("Chris"), USN (SEAL), one of the top snipers in the history of the American Armed Forces.  Chris' reputation as one of the deadliest snipers in the history of the American Armed Forces is well-documented and commonly accepted.  The Debtor routinely capitalizes on Chris' reputation, including his New York Times bestseller, American Sniper, and admittedly uses pictures of him on its website.

5.    On February 2, 2013, Chris was shot and killed at a shooting range.  On May 9, 2013, the Ellis County Court at Law No. One entered an Order Admitting Will to Probate and Authorizing Letters Testamentary, which appointed Chris' wife, Taya Kyle, independent executrix of the estate of Christopher Kyle.  At the time of his death, Chris and Taya had two children.

---

[1] *See* Disclosure Statement of Craft International, LLC at Pg. 15 [Docket No. 13] filed in Craft's bankruptcy cases styled *In re Craft International, LLC*, Case No. 14-32605-bjh11, currently pending before the United States Bankruptcy Court for the Northern District of Texas (the "Refiled Case")
[2] *Id.*
[3] *Id.*

**B.      The State Court Lawsuit.**

6.      On December 23, 2013, Taya Kyle, individually and on behalf of the Estate of Chris Kyle, filed her Original Petition, Application for Order Requiring Inspection of Craft's Books and Records, Application for Temporary Restraining Order and Temporary and Permanent Injunctive Relief and Application for Receiver (the "State Court Lawsuit").  The Lawsuit alleges that Young and French, who own and operate a competitor of the Debtor, Craft International Risk Management ("Craft Risk Management") have usurped the Debtor's business opportunities, diverted the Debtor's assets, contracts, copyrights and trademarks to other entities for their own benefit and to the exclusion of the Debtor, Taya and Chris's probate estate.  The State Court Lawsuit requests*, inter alia*, a declaratory judgment that Taya is entitled to review the books and records of the Debtor and an accounting from Craft Risk Management to determine the amount of funds improperly diverted from the Debtor.

7.      Admittedly, in response to the State Court Lawsuit, the Debtor filed for bankruptcy, which was subsequently dismissed by this Court. After re-filing for bankruptcy (the "Bankruptcy Case"), the Debtor has since filed a plan of reorganization (the "Plan")[Bk Docket No. 12], which proposes to eliminate all equity interests in the Debtor, including those held by Taya individually, or as Executrix of Chris's probate estate.[4] Also during the pendency of the Bankruptcy Case, the Debtor has filed its bankruptcy schedules showing that it is insolvent and multiple Operating Reports showing that it is either losing money or only making a minor profit.

**C.      The Likeness Adversary**

8.      On August 27, 2014, Taya filed her Original Complaint and Application for

---

[4] *See* Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by Craft International, LLC [Docket No. 12 in Bankruptcy Case].

Temporary and Permanent Injunctions (the "Adversary Complaint") [Adv. Docket No. 1]. The Adversary Complaint alleges violations of the Sections 26.011 and 26.013 of the Texas Property Code, which provide a cause of action for the unauthorized use of a deceased individual's name, likeness and image. More specifically, the Adversary Complaint alleges that the Debtor violated, and continues to violate, Chapter 26 of the Texas Property Code by its continued use of Chris Kyle's name, likeness and image. Finally, the Adversary Complaint requests both temporary and permanent injunctions to enjoin the Debtor from its continued unauthorized use of Chris' name, likeness and image.

9.      On September 29, 2014, Debtor filed its Answer and Affirmative Defenses to Plaintiff's Original Complaint and Application for Temporary and Permanent Injunction (the "Answer")[Adv. Docket No. 6]. Additionally, Debtor filed its Hearing Brief Regarding Taya Kyle's Request for Preliminary Injunctive Relief ("Debtor's Brief")[Adv. Docket No. 7]. As explained in more depth below, Debtor raises a number of defenses, many of which confuse the issues, or are inapplicable to the facts in this case.

## ARGUMENTS AND AUTHORITY

### I.      TAYA KYLE IS ENTITLED TO INJUNCTIVE RELIEF.

10.      Federal Rule of Civil Procedure 65 allows the Court to enter a temporary injunction. *See* Fed. R. Civ. P. 65; Fed. R. Bankr. P. 7065. In order to obtain a temporary injunction, Taya must establish: (1) that she is likely to succeed on the merits of her Chapter 26 cause of action; (2) that she will likely suffer irreparable harm in the absence of a preliminary injunction; (3) that the balance of the harms weigh in her favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Speaks v. Kruse*, 445 F.3d 396, 399-400

(5th Cir. 2006). The decision to grant a preliminary injunction is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden. *See Lake Charles Die sel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003); *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

### A.     Likelihood of Success on the Merits.

11.     In order to prove a cause of action under Chapter 26 of the Texas Property Code, Taya must prove: (1) that she is the rightful owner of the rights associated with Chris Kyle's name, likeness and image, (2) that the Debtor is using Chris Kyle's name likeness and image without Taya's consent in a manner not authorized by Chapter 26 of the Texas Property Code. *See* Tex. Prop. Code § 26.011; *see also Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 733 (N.D. Tex. 1997)(recognizing that Chapter 26 of the Texas Property Code creates a distinct and actionable cause of action). However, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As such, a party is not required to prove his case in full at a preliminary injunction hearing. *See id.*

12.     Taya Kyle and her children clearly have the exclusive right to use the name, likeness and image of Chris Kyle.[5] Chapter 26 of the Texas Property Code expressly provides that "[a]n individual has a property right in the use of the individual's name, voice, signature, photograph, or likeness after the death of the individual." *See* Tex. Prop. Code § 26.002. Chapter 26 further provides that the property right is freely transferable, in whole or in part, by contract or by means of trust or testamentary document, before or after the death of the individual. *See* Tex. Prop. Code § 26.004. In the event that the property right has not been transferred at or

---

[5] Debtor's arguments that Chris absolutely transferred the rights to his name, likeness and image to 5.11 are addressed below in Section II.A of this Brief.

before the death of the individual, the property right vests one-half in the surviving spouse and one-half in the surviving children or grandchildren. *See* Tex. Prop. Code § 26.005(a)(2). Because Chris had not transferred the property right to use his name, likeness and image, the property right now belongs exclusively to Taya and her children.

13.     The Debtor is using Chris' name likeness and image without Taya's consent. Debtor admits that Chris' name, likeness and image appear on the Debtor's website (which markets and sells merchandise with the Craft logo on it). Additionally, the Debtor's website emphasizes that "CRAFT was co-founded by Chris Kyle, USN (SEAL), one of the top snipers in the history of the American Armed Forces and author of The New York Times number one bestselling book American Sniper: The Autobiography of the Most Lethal Sniper in U.S. Military History, upon his honorable discharge."[6] Further, in describing the Craft Skull logo, the Debtor describes how the logo was designed by Chris Kyle and how it contains "several meaningful pieces of Chris Kyle's life and service to this great nation but mainly honors his fallen teammates."[7] It is undisputed that the Debtor is using Chris' name likeness and image and that Taya has not consented in writing to the Debtor's use.

14.     Section 26.011 makes clears that <u>any</u> unauthorized use of deceased individual's name, likeness and image is actionable. Specifically, Section 26.011 provides:

> Except as provided by Section 26.012, a person may not use, without the written consent of a person who may exercise the property right, a deceased individual's name, voice, signature, photograph, or likeness <u>in any manner</u>, including:
>
> > (1)     in connection with products, merchandise, or goods; or
> >
> > (2)     for the purpose of advertising, selling, or soliciting the purchase of products, merchandise, goods or services.

---

[6] *See* http://thecraft.com/AboutUs.html.
[7] *See* http://thecraft.com/craft_skull.html and co-store.com/craftgear

Tex. Prop. Code § 26.011(emphasis added). The word "including" further emphasizes, that the two examples given are not meant to be an exhaustive list of possibilities of how to use a deceased person's name, likeness and image. As noted already, the Debtor freely admits that it is using Chris' name, likeness and image on its website; thus, if Taya proves that such use is without her written consent, than she is likely to prevail on the merits.

15.     Notwithstanding the fact that any use by the Debtor would suffice, its use fits squarely within the defined prohibited uses specified in Section 26.011. The Debtor's use of Chris' name, likeness and image is directly connected to the Debtor's products, merchandise or goods. Specifically, the Debtor sells merchandise with a logo designed by Chris and the website describes specifically how Chris created the logo and the history behind the logo. Additionally, Chris' reputation as the "Legend" and the deadliest sniper in the history of the United States Armed Forces has particular value and a connection to the products and services sold by the Debtor—military training services. The Debtor capitalizes on Chris' reputation, and uses his name, likeness and image on its website to provide credibility and related to its sale or goods, services and merchandise. Consequently, Taya is highly likely to prevail on the merits of her Chapter 26 cause of action.

### B.     Irreparable Harm.

16.     If the Court does not grant the temporary injunction, Taya and her children will suffer irreparable harm. An irreparable injury is one that cannot be remedied by an award of economic damages. *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (5th Cir. 1981). Taya and her children will suffer irreparable harm in two ways: (1) the Debtor is insolvent, losing money and is unable to compensate Taya and her children for the Debtor's unauthorized use of Chris Kyle's name, likeness and image and any damage it may

cause to the intellectual property, (2) the Debtor's plan of reorganization proposes to cancel any equity interests Taya has in the Debtor, thus eliminating any control Taya has over the Debtor's use of Chris' name, likeness and image.

17.     The Debtor's monthly operating reports filed in this case and the Debtor's previous case demonstrate that the Debtor is losing money.  The Debtor's Disclosure Statement admits to a dramatic decline in revenue.  When an entity is insolvent and a plaintiff can show it is likely to succeed on the merits of its claim, irreparable harm may be presumed. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)(holding that irreparable harm may exist where damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected); *Hoxworth v. Binder, Robinson & Co., Inc.*, 903 F.2d 186, 206 (3d Cir. 1990)("unsatisfiability of a money judgment can constitute irreparable injury.").

18.     Without a temporary injunction, the Debtor may continue to use Chris' name, likeness and image and Taya Kyle has no control over the use of her intellectual property. The Debtor has already taken the position that Taya Kyle is not a member under the Debtor's operating agreement and is merely an assignee of Chris' interests in the Debtor with no ability to have any influence on any decisions made by the Debtor. If the Debtor is allowed to confirm its plan, which eliminates Taya's equity interest, she will permanently have no ability to influence or control the Debtor's use of Chris' name likeness and image.

C.     **Balance of Hardships.**

19.     The balance of harms weigh in Taya and the children's favor. Where an intellectual property holder loses control over its mark, the balance of harms weighs in favor of the intellectual property holder. *See TGI Friday's Inc. v. Great Northwest Restaurants, Inc.*, 652

F. Supp. 2d 763, 773 (N.D. Tex. 2009). In *TGI Friday's*, the District Court held that where a franchisee was using a franchisor's mark without the permission of the franchisor, irreparable harm existed and the balance of harm weighed in favor of the franchisor and granting an injunction. *Id.* The District Court explained that the franchisor's loss of control over its mark, and the potential loss of value that exists if the franchisor could not enjoin terminated franchisees from continued use of the mark, lead to the conclusion that the harms weighed in favor of the franchisor. *Id.* Similarly, Taya's inability to control the Debtor's use of the Chris' name, likeness and image, and the future loss of value if she cannot enjoin future unauthorized uses, outweighs any harm to the Debtor.

20.    Moreover, the harms to the Debtor are self-inflicted and thus the harms weigh in favor of Taya. Courts have held that when a defendant's harms are self-inflicted, the balance of harms analysis for an injunction weigh in favor of the plaintiff. *See e.g. Petro Franchise Sys., LLC v. All American Props., Inc.*, 607 F. Supp. 2d 781 (W.D. Tex. 2009); *NaturaLawn of America, Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 403 (D. Md. 2007). Because the potential harm to the Debtor arises from its inability to continue using intellectual property it does not have the right to use in the first place, the harms are self-inflicted and thus the balance of harms weigh in favor of Taya and granting the injunction.

### D.    Public Interest.

21.    For many of the same reasons already stated herein, the public interest is best served by granting the injunction. Principally, the public interest is best served by a policy of allowing intellectual property owners to defend their property and enjoin those that seek to infringe on those intellectual property rights. As noted above, without the ability to enjoin unauthorized uses, the defining feature influencing the value of intellectual property rights—the

exclusive nature of their use—will be lost and with it a substantial amount of value related to those property rights. More specifically, if anyone or any company can simply use Chris' name likeness and image without permission and Taya cannot enjoin the use, the brand and value related to the use of Chris' name likeness and image will be diminished. Consequently, the public interest is served by granting the injunction and allow intellectual property right owners to enforce those rights.

## II. DEBTOR'S DEFENSES ARE MERITLESS AND DO NOT PREVENT INJUNCTIVE RELIEF.

### A. Chris' Alleged License to 5.11 to Use his Likeness Does Not Prohibit Taya from Suing Under Chapter 26 of the Texas Property Code.

22. Debtor relies heavily on the fact that Chris purportedly signed a license to 5.11[8] to use his likeness in photography, video, animation or illustrations and 5.11 subsequently "gave the debtor permission to use 5.11's Images."[9] However, their reliance on this fact and the importance given to it is flawed for two reasons. First, the Debtor's argument that Chris "transferred the entirety of his property rights" to 5.11 is a misinterpretation or the Release[10] and a misunderstanding about the difference between "Copyright Rights" and "Publicity Rights." Second, in the License transfers solely 5.11 Copyright Rights and not Chris' Publicity Rights. Finally, even if the Debtor argues that the Release was a sub-license of 5.11's right to use Chris' name, likeness and image, such sub-license would be ineffective because 5.11 cannot sub-license that right to the Debtor.

> i. *Chris did not transfer his property rights by allegedly licensing them to 5.11.*

---

[8] "5.11" shall mean 5.11, Inc. and shall have the same meaning ascribed to it by the Debtor in its Debtor's Brief. *See* Debtor's Brief at ¶ 11.
[9] *See* Debtor's Brief at 21 (arguing that Taya lacks standing to enjoing the Debtor's use of 5.11's images because Chris "transferred the entirety of his property rights in those pictures to 5.11 in the Release.").
[10] "Release" as used herein shall have the same meaning ascribed to it by the Debtor in its Debtor's Brief. *See* Debtor's Brief at ¶ 12.

23. To the extent the Release referenced in the Debtor'a Brief is valid, its effect was solely to create a license for 5.11 to use Chris' name, likeness and image depicted in the photographs taken by 5.11. When pictures of an individual are used, there are two distinct property rights: (i) the right to use and copy the photographs (the "Copyright Rights") and (ii) the right to use the individual's name, likeness and image depicted in those photographs (the "Publicity Rights"). The Fifth Circuit has expressly held that that an individual's *persona*—his name, likeness and image—is separate and distinct from the subject matter covered by the Copyright Act. *See Brown v. Ames*, 201 F.3d 654, 657 (5th Cir. 2000)("the tort of misappropriate of name or likeness protects a person's persona…[which] does not fall within the subject matter of copyright.").

24. Debtor seems to both confuse and conflate these separate distinct property rights. Presumably, 5.11 would own the rights to copy and use the photos (the "Copyright Rights") of Chris Kyle because 5.11 was the "author." *See* 17 U.S.C. 201 ("Copyright in a work protected under this title vests initially in the author or authors of the work"). At the time the photographs were taken, Chris owned the rights to use his name, likeness and image (the "Publicity Rights"), which necessitated 5.11 to obtain a release from Chris or a license to use his name, likeness and image such that 5.11 could fully use the Images and Chris' likeness and image depicted therein. Assuming *arguendo* that the "Release" is valid, its effect would be a license (as opposed to an outright transfer as argued by Debtor) for 5.11 to use the photographs, which depict Chris' *persona*, thereby giving 5.11 both the Copyright Rights and the Publicity Rights.

25. When the alleged Release is read with this understanding, it is clear that Chris did not "transfer" his Publicity Rights to 5.11. The Release provides that Chris is providing "permission" (i.e., a license) for 5.11 to use his name likeness and image in the Images and

Testimonials.[11] The next sentence is an acknowledgement that Chris owns no rights in the Images and Testimonials themselves (i.e., the subject matter of the Copyright Rights); which makes sense because 5.11 was the author, not Chris. There is absolutely no logical or legal argument to support the Debtor's conclusion that the Release was a transfer, or that Chris' *persona* is now the exclusive property of 5.11.

> ii. *The License does not grant permission for Debtor to use Chris' Publicity Rights.*

26. The License[12] obtained by the Debtor merely allows the Debtor to use 5.11's Images and does not expressly mention or specify that 5.11 is sub-licensing any of the right it may have obtained via the Release (i.e., its right to use Chris' name, likeness in the Images). The pertinent language of the License specifically states:

> 5.11, Inc. ("5.11") hereby grants permission to Craft International, LLC ("Licensee"), pursuant to a non-exclusive, non-transferable (without right or sublicense), royalty-free, and revocable license to use images of 5.11 Tactical® products and personnel ("Images")[13]

Nothing in the language of the License indicates or communicates that 5.11 was sub-licensing the use of Chris name, likeness and image to the Debtor. Using the titles and descriptions from above, the License allows the Debtor to use 5.11's "Copyright Rights" (i.e., the rights to use the Images) but does not expressly allow or permit the Debtor to use Chris's "Publicity Rights" (i.e., the right to use likeness of Chris depicted in the Images). As such, Debtor's entry into the License does not cure its admitted unauthorized use of Chris' *persona*.

> iii. *5.11 cannot sub-license the purported license to use Chris' Publicity Rights it received in the Release.*

27. Regardless, even if Debtor had obtained a sub-license from 5.11 to use Chris'

---

[11] *See* Release, attached as Exhibit 9 to the Debtor's Brief.
[12] "License" shall mean the "License" defined in the Debtor's Brief and attached as Exhibit 10 to the Debtor's Brief. *See* Debtor's Brief at ¶ 13.
[13] *See* License attached at Exhibit 10 to Debtor's Brief.

Publicity Rights, such sub-license would be ineffective to defeat Taya's Chapter 26 cause of action because a licensee cannot sub-license the use of an individual's name, likeness or image. *See Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 938 (C.D. Cal. 2004), *aff'd*, 454 F.3d 975 (9th Cir. 2006). In *Miller*, the heirs of famous "big band" leader Glenn Miller sued the company that operated orchestras under the name "Glen Miller Orchestra." *See id.* at 931. The company, Glenn Miller Productions, Inc. ("GMP"), was established after Miller's death for the express purpose of owning and operating a traveling orchestra. *Id.* at 927. GMP obtained a license from Miller's widow who owned and controlled the intellectual property rights related to Miller's name likeness and image.[14] Sometime thereafter, GMP began "sub-licensing" the right to use Miller's name likeness and image and allowed other orchestras to use the name "Glenn Miller Orchestra." *Id.* at 929. Miller's heirs sued GMP for breach of the licensing agreement, infringement of the statutory right of publicity and a declaration that GMP could not sub-license the right to operate an orchestra under the name "Glenn Miller Orchestra" to third parties. *Id.* at 931. The court explained (first in the context of a trademark and then applying equal logic to publicity rights), that the owner of intellectual property rights have a "powerful incentive" to supervise the licensee's use of the intellectual property. *Id.* at 938. Allowing a licensee to sub-license intellectual property rights eliminates the licensor's ability to police the use of its intellectual property. As the court in *Miller* noted:

> If GMP were permitted to sub-license Glenn Miller's publicity rights without notifying or obtaining permission from the owner of those rights…it could sub-license Glenn Miller's publicity rights to a third party who used his name or photograph or likeness to promote facism or pornography. Such use presumably would horrify Glen Miller if he were alive; it also would adversely affect the image of Glenn Miller that Plaintiffs (successors to their mother, the original licensor) may wish to preserve. However, absent a sub-licensing rule, Plaintiffs

---

[14] Taya notes that California's right of publicity statute related to the use of a deceased person's name likeness and image is substantially similar to the cause of action in Chapter 26 of the Texas Property Code. *Compare* Cal. Civ. Code § 3344.1 *and* Tex. Prop. Code 26.011, 26.013.

would have no ability to prevent GMP from sullying their father's name (and, in fact, would have no right to even know that GMP was doing so). In addition, any disputes about whether GMP could sub-license Glenn Miller's right of publicity to a particular third party, or whether a third party sub-license was acting beyond the scope of the original license, would trigger litigation. These are undesirable results.

*Id.* at 938. But for the fact that the License does not actually sub-license 5.11's alleged right to use Chris name, likeness and image, the facts in this case are strikingly similar to the facts in Miller. Like GMP, 5.11 does not have the ability or the legal right to sub-license any right that it may have to use Chris' name likeness and image. The rationale of *Miller* is further amplified in this case because as explained above, the Debtor is proposing to terminate any ownership Taya or Chris' probate estate has in the Debtor and thus Taya will have no control over the Debtor's use of Chris' name likeness and image.

**B.     Taya's Ownership of Only 50% of Property Rights in Chris' Name, Likeness and Image Does Not Bar the Claims.**

28.     Although Taya only owns 50% of the property interests described in Chapter 26 of the Texas Property Code, it does not preclude her from filing suit based upon violations of Section 26.011. Section 26.005(c) provides that "[i]f the property right is split amount more than one person, those persons who own more than one-half interest in the aggregate <u>may</u> exercise the right on behalf of all persons who own the right." *See* Tex. Prop. Code § 26.005(c)(emphasis added). In other words, an owner can exercise her rights she owns under the statute exclusive of whether she controls 50% of the property right, but she <u>may</u> exercise those rights on behalf of all owners if she owns more than one-half of the interests. Debtor attempts to translate this provisional ability into a prerequisite for filing a cause of action. At a minimum, Taya has standing to commence suit on her 50% ownership of the publicity rights.

29.     Nevertheless, Taya can likely exercise her children's rights in the other 50% as a

"next friend" or as the sole managing conservator of the children. Texas Civil Procedure 44 provides that "[m]inors, lunatics, idiots, or persons non compos mentis who have no legal guardian may sue and be represented by 'next friend'…[when] such next friend shall have the same rights concerning such suits as guardians have, but shall give security for costs, or affidavits in lieu thereof, when required." Tex. R. Civ. P. 44(1). Here, Taya's interest are certainly aligned with her children's interest and thus, if necessary, she can represent them as "next friend." Additionally, the Texas Family Code provides that a parent designated the sole managing conservator has "the right to represent the child in legal action and to make other decisions or substantial legal significance concerning the child." Tex. Fam. Code § 153.132(5). As the children's only surviving parent, Taya is the children's sole managing conservator and thus has the right to make legal determinations on behalf of the children. Accordingly, the Court should find that Taya has standing to purse the rights on behalf of her children as well.

**C. Chris' Status as a Public Figure Does Not Preclude the Chapter 26 Causes of Action.**

30. Debtor's argument that Chris' status as a public figure is a defense to liability demonstrates a misunderstanding of the concepts of "Right of Privacy" and "Right of Publicity." Accordingly, the Court should find that Chris' status as a public figure and the public nature of his life story, do not preclude Taya from pursuing the causes of action plead in the Original Adversary Complaint.

*i. "Right of Publicity" vs. "Right of Privacy"*

31. The causes of action pled pursuant to Chapter 26 of the Property Code are based upon the "Right of Publicity" and not the "Right to Privacy" and thus the distinction that he is a public figure has no bearing on Debtor's admitted unauthorized use of Chris' name, likeness and image. While often used in the same context, the "Right to Publicity" and "Right to Privacy" are

distinct concepts. *See* J. McCarthy, *Melville B. Nimmer and the Right of Publicity: A Tribute*, 34 UCLA L. Rev. 1703, 1704 (1987); *see also Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F. 2d 866, 868 (2d Cir. 1953)("in addition to and independent of that right of privacy…a man has a right in the publicity value of his photograph."); *U.S. Life Ins. Co. v. Hamilton*, 238 S.W.2d 289, 292 (Tex. Civ. App.—Waco 1951, writ ref'd n.r.e.). The "Right of Publicity" is often described as the "inherent right of every human being to control the commercial use of his or her identity." *See Henley v. Dillard Dept. Stores*, 46 F. Supp. 587, 590 (N.D. Tex. 1999); *Elvis Presley Enters, Inc. v. Capece*, 950 F. Supp. 783, 801 (S.D. Tex. 1996), *reversed and remanded on other grounds* 141 F.3d 188 (5th Cir. 1998); McCarthy, 34 UCLA L. Rev. at 1704 (1987). Alternatively, the "Right of Privacy" is often described as "the right of an individual to be left alone, to live a life of seclusion, to be free from unwarranted publicity." *Billings v. Atkinson*, 489 S.W.2d 858, 859 (Tex. 1973); *see also Moore v. Big Picture Co.*, 828 F.2d 270, 272 (5th Cir. 1987).

32.    An individual's celebrity or "public figure" status does not constitute a waiver of his publicity rights. *See* McCarthy, 34 U.C.L.A. at 1707-08. Moreover, because the "Right of Publicity" exists to protect the commercial value of an individual's name, the right usually becomes important only when the plaintiff (or potential plaintiff) has achieved some degree of celebrated status. *See* Melville B. Nimmer, *The Right of Publicity*, 19 Law & Contemp. Probs. 203, 216 (1954). As explained in more detail by McCarthy and Nimmer, the "Right of Publicity" arose out of the inadequacy of the "Right of Privacy" to protect a public figure's right to control the commercial value of his identity. McCarthy, 34 U.C.L.A. at 1707; Nimmer, 19 Law & Contemp. Probs. at 204-05. Courts often ruled that a celebrity waived his right of privacy by becoming a public figure, and thus there was no cause of action to prevent any type of

unpermitted commercial use of identity. *See e.g. O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 169-70 (5th Cir. 1942) ("considered from the standpoint merely of an invasion of plaintiff's right of privacy, no case was made out, because plaintiff was an outstanding national football figure and had completely publicized his name and his picture."). In *O'Brien*, Justice Holmes noted in his dissent the issue with the Right of Privacy and argued (before the separate "Right of Publicity" had been established) that the "right of privacy is distinct form the right to use one's name or picture for purposes of commercial advertisement." *Id.* at 170 (Holmes, J. dissenting). The majority addressed Justice Holmes' concerns by explaining:

> Nothing in the majority opinion purports to deal with or express an opinion on the matter dealt with in the dissenting opinion, the right of a person to recover on quantum meruit, for the use of his name for advertising purposes. That was not the case pleaded and attempted to be brought. The case was not for the value of the plaintiff's name in advertising a product but for damages by way of injury to him in using his name in advertising beer.

*O'Brien*, 124 F.2d at 170. Years later, in another case involving a standout college athlete, the Texas Court of Civil Appeals would distinguish *O'Brien* and explain that the cause of action in *O'Brien* involved the right of privacy and not the "unauthorized appropriation and use of his name and likeness in an advertising program," *See Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719, 721 (Tex. Civ. App.—Eastland 1975, writ ref'd n.r.e.). *Kimbrough* emphasized and made clear that there is a distinct difference between the "Right of Privacy," which protects an individual's right to be left alone and may be waived by an individual who seeks the public spotlight, and the "Right or Publicity" that protects an individual's right to control the commercial use of his name, likeness and image and is not waived by the individual being a public figure.

> ii.  *Chris' status as a public figure does not prevent Taya from exercising the statutory "Rights of Publicity" specified in in Chapter 26 of the Texas Property Code.*

33.     Debtor relies primarily on two cases, *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) and *O'Brien* to support its conclusion that Chris' status as a public figure allows the Debtor to use Chris' name, likeness and image. However, Debtor's reliance on these cases is misplaced and its arguments misapprehend the difference between the "Right of Privacy," the "Right of Publicity" and how those rights apply to a pubic figure. The facts in *Matthews* are patently different than the facts in this case. The basis of the plaintiff's cause of action in *Matthews* was the defendants' use of the Plaintiff's life story. *See Matthews*, 15 F.3d at 437 ("There is nothing unique about [plaintiff's] name or likeness that creates value for [defendant] to appropriate. She is not 'cashing-in' on good will associated with his name but is simply converting factual events that happen to include Matthews into fiction."). Central to the Fifth Circuit's ruling in *Matthews* was the holding that the plaintiff's life story is not a "name or likeness" for purposes of applying the tort of misappropriation, and "likeness" does not include general incidents from a person's life, especially when fictionalized. *See id.* at 437-38. Here, Taya's Chapter 26 causes of action are not based upon the Debtor's use of Chris Kyle's life story but are based upon the Debtor's use of Chris' name likeness and image and the value associated with his *persona*. The Debtor is not a biographer, book publisher nor movie producer (as was the case in *Matthews*), the Debtor is a commercial entity organized to sell combat training classes and merchandise with a logo designed by Chris. Debtor is using Chris' name, likeness and image, and his reputation as a legendary war hero, to lend credibility to itself, promote the services it provides and products its sells. Accordingly, the facts in *Matthews* are distinguishable from the facts in this case.

34. Debtor's reliance on *O'Brien* is likewise misplaced. As explained in detail above, the "Right of Privacy" and "Right of Publicity" are separate distinctive rights. The Fifth Circuit's language and rationale in *O'Brien* makes clear that O'Brien had plead his causes of action as an invasion of his right of privacy and thus the trial court and Fifth Circuit analyzed the causes of action under a "Right of Privacy" rubric. *See O'Brien*, 124 F.2d at 170. As explained above, celebrity and public figures have a difficult time enforcing their "Right of Privacy" (i.e., right to be left alone) when they have taken steps to put themselves in the public spotlight. The Chapter 26 cause of action alleged in the Adversary Complaint on the other hand, is based upon a statutory "Right of Publicity," and not the "Right of Privacy." Therefore the rationale in *O'Brien* is inapplicable. Again, as explained *supra*, an individual does not waive his "Publicity Rights" by becoming a public figure. Further, the "Publicity Rights" have little or no value if the individual is not a public figure. Accordingly, the Court should find that Chris' status as a public figure and the public nature of his life story, does not preclude Taya from pursuing the causes of action plead in the Adversary Complaint.

**D.      Debtor's Admitted Use of Chris' Name Likeness and Image is a Violation of Section 26.011.**

35. The Debtor's use of Chris' name, likeness and image is not merely incidental and the Debtor's attempt to argue that they are not using Chris' *persona* for the value associated with it is not genuine. Borrowing from the common law tort of misappropriation (which is different in several respects to the statutory right of publicity alleged in the Original Adversary Complaint) Debtor argues that three factors must be proven to show that it misappropriated the use of Chris' name, likeness and image: (a) Debtor appropriated Chris' name or likeness for the value associated with it, and not for an incidental manner or for a newsworthy purpose; (b) Chris can be identified from the publication; and (c) there was some advantage or benefit to the Debtor.

*See* Defendant's Brief at ¶ 43 (*citing Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663 at *6 (E.D. Tex. 2009). Debtor's attempt to add additional requirements to the statute (i.e., that Taya must show that the Debtor's use is not merely incidental) is beyond the plain language of Section 26.011 outlined above, which provides that <u>any</u> unauthorized, or unapproved use of a deceased individual's name, likeness and image is actionable.[15] Nonetheless, Debtor admits that Chris' name and likeness appear on its webpage and it does not appear to dispute that it derives a benefit from using Chris' name and image on its website. Instead, Debtor argues that use of Chris name, likeness and image on its website is "incidental" to its business and its sales of training classes and merchandise. In furtherance of this argument, Debtor posits that (i) there is no use of Chris' name with any description of the merchandise that the Debtor is selling, (ii) Chris' name does not appear in any of the descriptions of the Debtor's training classes, and (iii) the Debtor is not using Chris' name to sell its merchandise, training classes or anything else. Notwithstanding those points, the fact that Chris' name may not appear on the page referencing the services and merchandise being sold, does not mean that his name, likeness and image are not being used to sell services and merchandise, or that the Debtor is receiving a commercial benefit from the use of Chris' *persona*.

36. The facts in this case are dramatically different than both of the cases relied on and analyzed by the Debtor. The Debtor's products are certainly different than magazines[16] and Dixie Cups[17] that each have value separate and apart from the use of a public figure's name or image. Here, the services (highly specialized military training classes) and products (merchandise with the logo designed by Chris) sold by the Debtor have added value because of Chris' reputation. Put another way, Chris affiliation with the Debtor is a principal reason why

---

[15] *See supra* at ¶ 13.
[16] *See Namath v. Sports Illustrated*, 48 A.D. 2d 487 (N.Y.A.D. 1 Dept. 1975).
[17] *See Vinci v. American Can Corp.*, 591 N.E.2d 793 (Ohio App. 8th Dist. 1990).

many customers choose to do business with the Debtor. Consequently, the Debtor can hardly argue that the use of Chris' name, likeness and image is incidental to its business.

37.     As pointed-out by the Debtor, the "incidental use exception" has four factors: (i) whether the use has a unique quality or value that would result in commercial profit to the defendant; (ii) whether the use contributes something of significance; (iii) the relationship between the reference to the person and the purpose and subject of the work; and (iv) the duration, prominence or repetition of the likeness relative to the rest of the publication. *See* Debtor's Brief at ¶ 48 (internal citations omitted). A brief analysis of these factors clarifies that the Debtor's admitted use of Chris' name, likeness and image is not incidental. Chris reputation as a heavily decorated war hero and the deadliest sniper in the history of the United States Armed Services certainly adds a unique quality and value that directly translates into commercial profit for the Debtor. Equally, the use of Chris name and reputation by the Debtor definitely contributes something of significance—credibility.   The Debtor markets itself as providing training and consulting services and touts itself as being "founded by a mix of Special Operations Forces Operators and successful businessmen."[18] What better reference, than associating yourself with one of the greatest "Special Operations Forces Operators" to have ever taken the battlefield? Finally, although the Debtor argues that Chris' name does not appear next to pictures of him, and does not appear on the pages selling apparel, it is the prominence of: (a) his picture at the top of the "about us" page describing the Debtor, (b) the use of his name (the only name given in the about us page) in describing management and the company's "technical expertise and operational knowledge," and (c) the use of his name in describing the creation of the logo, which is the basis of the Debtor's merchandise sale.  The Debtor's use of Chris' name is definitely more than incidental and as such the Court should find that Taya is likely to succeed

---

[18] *See* http://thecraft.com/AboutUs.html.

on her Chapter 26 causes of action.

## CONCLUSION

38.    It is undisputed, and Debtor admits, that it is using Chris name, likeness and image. Also undisputed, is the fact that Taya and her children have not authorized the Debtor's use. Based upon the facts in this case, Taya will likely prevail on her Chapter 26 Causes of Action. Further, she will suffer irreparable harm if the Court does not grant the injunction, the equities weigh in favor of granting the injunction and the pubic is best served by a policy of allowing owners of intellectual property to enforce their rights and enjoin the unauthorized use of their intellectual property rights. Debtor argues principally that the License and Chris' status as a public figure allow it to use Chris' name likeness and image without Taya's permission and in contravention of Chapter 26 of the Texas Property Code. For the reasons stated and explained herein, neither of those two defenses are valid and neither acts as a impediment to Taya obtaining injunctive relief. For the reasons stated herein, Taya respectfully requests that the Court grant her request for a temporary injunction.

WHEREFORE PREMISES CONSIDERED, Taya respectfully requests that the Court grant her request for a temporary injunction outlined and specified in the Adversary Complaint and that the Court grant such other and further relief that Taya may be entitled to, whether in law or equity.

Dated: October 2, 2014

Respectfully submitted,

/s/ Jason P. Kathman
Gerrit M. Pronske
Texas Bar No. 16351640
Jason P. Kathman
Texas Bar No. 24070036
**PRONSKE GOOLSBY
& KATHMAN, P.C.**
2200 Ross Avenue, Suite 5350
Dallas, Texas 75201
Telephone: 214.658.6500
Facsimile: 214.658.6509

**COUNSEL FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned does hereby certify that, on October 2, 2014, the foregoing pleading was served electronically via the Court's electronic transmission facilities and also via email upon the parties listed below.

Patrick J. Neligan, Jr.
Email: pneligan@neliganlaw.com
Seymour Roberts, Jr.
Email: sroberts@neliganlaw.com

**Counsel for the Debtor**

/s/ Jason P. Kathman
Jason P. Kathman